BETTY M. RAILSBACK, administratrix of estate of Loy Earl Railsback, deceased, and BETTY M. RAILSBACK, appellee, v. GEORGE E. BUESCH, administrator of estate of Edward Charles Kuhr, deceased, and the ESTATE OF EDWARD CHARLES KUHR, appellants.

No. 50422.

MAY 8, 1962.

Stuart & Stuart, of Chariton, for appellants.

Killmar & Reynoldson, of Osceola, for appellee.

OLIVER, J.—March 6, 1958, an automobile owned and operated on an Iowa highway by Edward Charles Kuhr of Sedalia, Missouri, collided with a light truck operated by Loy Earl Railsback of Clarke County, Iowa. Both drivers were killed. There were no eyewitnesses.

Section 321.512, Code of Iowa, 1958, entitled, Action against insurance, provides, an automobile-liability-insurance policy "of a nonresident motorist in Iowa shall, in the event of the death of said nonresident, be considered an asset of his estate having a situs in Iowa in any civil action arising out of a motor vehicle accident in which said nonresident may be liable." Decedent Kuhr had such a policy of insurance issued by State Farm Mu-

tual Automobile Insurance Company of Bloomington, Illinois. This is an action against that insurance for damages to the estate of Railsback for his death. To such action the legal representative of the estate of Kuhr in Iowa was an indispensable party defendant.

Attorneys Killmar & Reynoldson, who represented Betty M. Railsback, widow of Loy, had secured her appointment in Clarke County as administratrix of the Railsback estate. Subsequently, upon her application they secured the appointment of George E. Buesch, a realtor and abstractor, of Osceola, as administrator of the estate of Charles Kuhr in Iowa.

Thereafter Mrs. Railsback, administratrix of the Railsback estate, brought this action for damages, nominally against George E. Buesch, administrator of the Kuhr estate in Iowa, but actually against Kuhr's liability insurance issued by State Farm Mutual. Trial to a jury resulted in judgment for plaintiff for $18,215.46 with interest and costs. Defendant has appealed.

I. The first error assigned for reversal is to the order of the trial court permitting the filing of the Railsback claim against the Kuhr estate after the expiration of the time for filing claims.

Code section 633.46 requires administrators to publish notice of their appointment "within ten days after the receipt of their letters." The appointment of Mr. Buesch as administrator of Kuhr was made May 12, 1958, and the notice thereof was published in the Osceola Sentinel, May 15 and May 22, 1958. It was signed George E. Buesch, Killmar & Reynoldson, attorneys.

Code section 635.68 provides claims not filed within six months from the giving of the notice of appointment "will be barred * * * unless peculiar circumstances entitle the claimant to equitable relief." Mr. Killmar testified that in the fall term of court he checked the Kuhr estate file and discovered the six-month period for filing claims had expired (November 15, 1958).

He promptly (November 28) filed application by Mrs. Railsback, administratrix, for equitable relief against the bar of the statute and for permission to file her claim against the Kuhr estate. He also prepared an appearance which was signed by Buesch, administrator, and which acknowledged receipt of copy of Mrs. Railsback's application, entered the appearance of

Buesch as administrator of the Kuhr estate, waived time and place of hearing, and requested the court to make such proper order as would protect the rights of all persons interested. The application was tried to Judge H. J. Kittleman who found peculiar circumstances existed, entitling Mrs. Railsback to equitable relief against the bar of Code section 635.68, and so ordered, November 28, 1958.

The same day, plaintiff's petition at law in the case at bar was filed in the District Court of Clarke County and original notice of the action was served upon Buesch, administrator of the estate of Kuhr.

November 29, Mr. Buesch mailed to the insurance company, with an explanatory letter, the various instruments served upon or handed him the previous day, including a copy of the Petition at Law in the case at bar. That was the first time he had contacted the insurance company which previously had no actual knowledge the Kuhr estate was being probated in Iowa.

December 17, Stuart & Stuart appeared in the Kuhr probate proceedings for administrator Buesch and the insurance company and moved to set aside the order granting Mrs. Railsback equitable relief from her failure to file her claim within the six months. They alleged the Kuhr administrator, being friendly to the claimant, filed his appearance and consented to the jurisdiction of the court without notice to the insurance company, to whom no opportunity to resist the application was given, as required by the contract of insurance with decedent, and that the proceeding was, in effect, ex parte.

In cases of this type against insurance, the appointment of an employee of plaintiff's attorney, as administrator of defendant's estate has not been considered improper, since the object of such appointment was to secure a representative of such estate against whom the creditor's claim might be asserted. See Galloway v. Farber, 252 Iowa 360, 106 N.W.2d 920, and citations. It follows that the insurance company should have the right to control and conduct the defense and the administrator should not interfere with the legal exercise of that right. It appears counsel for claimant realized this because they filed written consent (subsequently orally enlarged) that the original order granting equitable relief be set aside and the matter stand for trial upon

1068

claimant's original application for equitable relief, filed November 28, and as though no evidence had been introduced. This was done and the matter was retried to the court upon that application and a resistance thereto by Stuart & Stuart, for the insurance company and for Buesch, administrator.

At this trial there was evidence that May 5, 1958, Mr. Killmar wrote about the claim to the Missouri agent of State Farm Mutual who had sold the insurance to Kuhr. On June 15 Mr. Killmar wrote the insurance company in Bloomington, Illinois, he was ready to commence action for the Railsback estate. Neither letter was answered. However, during the week of June 23, 1958, Mr. Stan Lamfers, a field representative of the insurance company, called at Mr. Killmar's office, told him they would try to negotiate a settlement of the Railsback claim and asked him to make an offer. No offer was made at that time. Mr. Lamfers called upon Mr. Killmar several times. His last call was made late in the fall of 1958. At that time Lamfers said he had information decedent had been disabled by arthritis. He asked Mr. Killmar to get a statement from decedent's doctor on that point. Killmar agreed to do that and to let Lamfers submit it to the company with a formal demand, before filing suit. Killmar secured this information and placed it in his file awaiting the return of Lamfers. Before Lamfers returned Killmar discovered the time for filing claims in the Kuhr estate had expired November 15.

Mr. Lamfers testified, they were attempting to get information back and forth to the point that Mr. Killmar might make a demand that the insurance company would accept, and they would settle the claim without a suit.

The single purpose for the administration of the Kuhr estate in Iowa was and is the processing of the Railsback claim against Kuhr's liability insurance. The estate is open. This insurance is its only asset. The claim against the insurance is its only liability. No heir, survivor or other claimant has any interest in this insurance. Nor would the rights of any such person be affected by the delay in filing this claim or by its allowance. The delay in filing it was short. The trial court found the reason it was not timely filed was the pending negotiations for settlement. This finding is supported by the record.

We agree with the conclusion of the trial court that claimant showed peculiar circumstances entitling her to equitable relief from the bar of her claim against the Kuhr estate for failure to file it within six months from the giving of the administrator's notice.

Although no decision is directly in point the reasoning of the following supports this holding: Burroughs v. McLain, 37 Iowa 189, 191; Roaf v. Knight, 77 Iowa 506, 508, 42 N.W. 433; Gross v. Hocker, 243 Iowa 291, 302, 51 N.W.2d 466; Rindfleisch v. Mundt Estate, 247 Iowa 1124, 1128, 1129, 77 N.W.2d 643; Cave v. Fahan, 249 Iowa 1374, 92 N.W.2d 434; In re Estate of Smith, 248 Iowa 857, 82 N.W.2d 737.

■ II. Other errors assigned by appellant are based upon the claimed excessive amount of the verdict. The instructions limited to $25 the recovery for medical and hospital services, and stated $690.46 was the damage stipulated for premature funeral expenses. The main item of damage submitted to the jury was $35,000 for "the present worth or value of the estate which he would reasonably be expected to have saved and accumulated, from the date of his death, if he had lived out the term of his natural life."

The verdict was for $18,215.46 with interest and costs. Apparently this included $25 for medical and hospital services, $690.46, the amount stipulated for premature funeral expenses and $17,500 for the present value of the estate he would be expected to have saved and accumulated, from the date of his death, had he lived out the term of his natural life. It will be observed $17,500 is exactly one half of the damages claimed by plaintiff for this item. Mr. Railsback was fifty-three years old when he died. Plaintiff introduced mortality tables showing the life expectancy of a person of that age was 19.19 years.

The Railsbacks were married in 1940. He was a mechanic or machinist. Mrs. Railsback was a practical nurse and was working at a sanitarium. They moved to Bellevue, Iowa, where he worked as a machinist for a few months. Then World War II became critical and he went to defense school in Kansas City and from there to the government ordnance plant in Ankeny, Iowa. From 1942 to 1947 they lived in Webb City, Missouri, where he worked and she was employed as a nurse. They lived

and worked also in Oak Ridge, Tennessee, and Odessa, Texas. At Webb City they bought a home and some livestock, on ten acres of ground. They sold this when they left there in 1947. They lived in Oregon about two years. There he operated a service station and garage and she assisted. Following this he worked in garages and machine shops. He never had any trouble getting a job. She did some work in a hospital at Nevada, Iowa.

In 1951 they returned to Osceola and he worked in his father's shoe repair shop and also did some furniture repairing, upholstering and refinishing. By 1952 his two children by his former marriage were grown and "he wasn't required to spend any money except on his own business and home." His upholstering and repair work increased and he devoted all of his time to it.

In 1952 they bought for $6000 a building, formerly a hatchery, on four acres of ground near Osceola. The terms were $600 down and the balance in monthly payments. They converted it into living quarters and rooms for upholstering furniture, and for cabinet work and refinishing, and otherwise improved it. At the time of his death they had paid more than $3000 on the purchase price. Mrs. Railsback worked in the shop with her husband from October 1952 to the summer of 1957 when she went back to nursing and he hired two men to take her place. During their married life they had a joint bank account for all money received by either. He signed most of the checks.

Plaintiff made and placed in evidence a list of the equipment in the furniture shop purchased from 1951 to 1958. She listed certain items for which she estimated the cost had totaled several thousand dollars. "Some of it would be rather old and some of it reasonably new." Part of it was sold at a public sale after the death of Mr. Railsback. There was no evidence of the value of the equipment at the time of his death nor of the amount for which some of it sold. His truck had cost about $2000 in 1957. The unpaid balance of its purchase price was about $800. .

Commencing with May 1957 she worked part time at a hospital, relieving nurses on vacation. From September 1957 until February 1958 she was employed at Clarke County Hospital at $140 per month. She was still so employed at $155 per month

at the time of trial, December 1950. She testified:

"At the time of Earl's death there was some rather old bills that had been contracted in connection with this business that were unpaid. There were some doctor bills for the injuries he had received in 1957 which were still unpaid at the time of his death. Earl was the kind of person that would pay his bills if the income was there so he could. Q. So the fact is that the income from his business was actually not sufficient to keep his obligations paid and support you and he, isn't that true? A. Some of those bills, there were arrangements to be made that—there was one doctor bill that he told me about that the doctor said that he had plenty of work in his office, upholstery work, he wanted done, and he said that was the way he would take out his money for that. There were other bills for lumber and things of that kind. He just didn't have the income to pay them.

"* * *

"The equity that we had in the property, real estate, plus whatever value these tools was, was the extent of the property that had been accumulated by me and my husband. And that, of course, was subject to the debts and obligations that Earl owed at the time of his death."

Mrs. Railsback testified she did not know of any year from 1951 through 1958 in which she and her husband were required to pay any income tax on their joint earnings. They had no children.

The jury allowed $17,500 for the present value of the estate decedent would reasonably be expected to have saved and accumulated, from the date of his death, if he had lived out the term of his natural life. Although the award for this item is necessarily somewhat of an approximation, we are satisfied the amount allowed is substantially in excess of what the record supports and the judgment should be reduced by $5000 to $13,215.46 with interest and costs. Ferris v. Riley, 251 Iowa 400, 414, 101 N.W. 2d 176, 184; Soreide v. Vilas & Co., 247 Iowa 1139, 1153, 1154, 78 N.W.2d 41.

Therefore, the judgment is affirmed on condition that plaintiff shall within thirty days from the filing of this opinion file a remittitur of all the judgment in excess of $13,215.46, with

interest on such excess, otherwise a new trial will be granted.— Affirmed on condition.

All JUSTICES concur except MOORE, J., who takes no part.